JUDGE FAILLA    14 CV    7702

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                            :
JOHN HALPERN,                                               :        **COMPLAINT AND
                                                            :        DEMAND FOR JURY TRIAL**
                              Plaintiff,                    :
                                                            :
                v.                                          :
                                                            :
MATTHEW WHITE,                                              :
                              Defendant.                    :
                                                            :
                                                            :
-----------------------------------------------------------------x



## INTRODUCTION

By and through the present Complaint, plaintiff John Halpern seeks redress against

defendant Matthew White, plaintiff's erstwhile partner in Bleecker Street Ventures, LLC, an ill-

fated venture that defendant White fraudulently induced Halpern to form and fund with a

substantial investment.  As will be further explicated below, Halpern, whose daughter Lily is a

talented singer and songwriter, was introduced to White in or about March of 2012.

Significantly exaggerating and, in certain instances, fabricating, his purported success,

experience and contacts in the music industry, White persuaded Halpern to invest in the venture,

with promises that White would launch the career of plaintiff's daughter; further his own

activities as a recording artist and songwriter and share with Halpern what White represented

would be the substantial revenues generated therefrom; and locate and "sign" other writers and

recording artists to the venture and similarly share with Halpern the significant additional

financial rewards that White again assured Halpern would result.

In reliance on White's many misrepresentations, Halpern entered into an agreement with

White pursuant to which Halpern committed to fund the venture, and White agreed to repay

Halpern's investment, with a significant return, from the substantial revenues that White assured plaintiff would be quickly generated from the venture.

White, however, was not content simply to defraud Halpern into entering into and funding the parties' venture. Once White had accomplished that initial goal, through yet further misrepresentations and dissembling, White misappropriated and diverted to his own benefit a significant portion of the substantial funds that plaintiff had invested with him, including additional funds that White also induced Halpern to advance to him after the parties agreed to proceed with the venture. When Halpern confronted White with his concerns, White promised that he would promptly provide Halpern with a detailed accounting of the venture's finances and assured Halpern that, in the event that the venture's income was insufficient to repay Halpern for his investment, White would do so from the significant royalty income and other substantial assets that White claimed to possess.

When these promises proved to be as hollow and false as those that had initially induced Halpern to enter into and fund the venture, White agreed to convert plaintiff's investment in the venture into a loan and repay the same. Yet, when Halpern attempted to document that agreement, White continued in his deflection and failed to proceed with the promised restructuring.

Ultimately, plaintiff advanced in excess of $500,000 to the parties' venture and, despite White's manifest contractual and fiduciary obligations to Halpern during the period in which the venture was operative, Halpern has not recouped any of those funds.

Through the present action, plaintiff seeks redress against White for, *inter alia*, his fraud, conversion, breach of the parties' joint venture agreement and breach of his fiduciary duties to Halpern. Specifically, Halpern seeks rescission of his agreement with White and the return of

his investment; compensatory and punitive damages; the judicial dissolution of Bleecker Street Ventures, LLC and the winding up of the venture's affairs; and a comprehensive fiduciary accounting of White's disposition of Halpern's funds and, more generally, of the financial affairs of the venture.

In further support of his claims herein, plaintiff John Halpern alleges and avers as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff John Halpern ("Halpern") is an individual who resides in Brookline, Massachusetts.

2.    Defendant Matthew White ("White") is an individual who, upon information and belief, resides at 305 East 86th Street, Apartment 17KW, New York, New York.

3.    This Court has subject matter jurisdiction over the within action pursuant to 28 U.S.C. § 1332 in that the action involves citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

4.    This Court has personal jurisdiction over White pursuant to, *inter alia*, CPLR § 301, in that White resides in the State of New York.

5.    This Court also possesses personal jurisdiction over White pursuant to the parties' joint venture agreement, in which the parties agreed "to submit to the jurisdiction of the federal or state courts located in New York City in any action which may arise out of this agreement and said courts shall have exclusive jurisdiction over all disputes between [Halpern] . . . and [White] pertaining to this Agreement and all matters related thereto."

6.    Venue is proper in this judicial district pursuant to, *inter alia*, 28 U.S.C. §§ 1391(a)(1) and (a)(2) in that White resides in this judicial district, and as a substantial portion

of the events and omissions giving rise to plaintiff's claims occurred within this judicial district. Venue is also proper in this judicial district pursuant to the language of the parties' joint venture agreement, quoted in the immediately preceding paragraph of this Complaint.

## FACTUAL BACKGROUND

7.    Halpern is a businessman and investor who resides in the Commonwealth of Massachusetts. Prior to his involvement in the matters relevant to this action, Halpern had no experience in, and extremely limited knowledge concerning the music and entertainment industries.

8.    White holds himself out to be a successful singer, songwriter, recording artist and record producer, with vast experience and a network of impressive contacts in the music industry. While White was, for a time, signed as a recording artist first to Interscope Records and later to the Warner Music Group ("WMG"), his career faltered and he did not realize nearly the level of success that he publicly claims to have achieved.

9.    Halpern's daughter, Lily Halpern ("Lily"), is a singer and songwriter who performs professionally under the name "Lily Lane."

10.    In or about 2011, Lily entered into an arrangement with Aja Patterson, who was an assistant to Lyor Cohen, a well-known and highly successful record company executive who, at the time, was WMG's Worldwide Chairman and CEO of Recorded Music. Based on Patterson's affiliation with Mr. Cohen, Halpern and Lily were hopeful that she would be able to provide valuable guidance and direction for Lily's developing career.

11.    During the period from in or about mid-2011 until in or about March of 2012, Lily, under Patterson's supervision, recorded twelve compositions, which Lily and Halpern hoped would be suitable for inclusion on a contemplated album. However, the recordings, which

were produced at substantial cost and expense to Halpern, were never delivered to Lily. As a result, Lily required a new producer and had to start the recording process basically from inception.

12.     In or about March of 2012, Patterson introduced Halpern and Lily to White, and suggested that White take over the role of producer of four additional, new recordings of Lily. During the parties' initial discussions, White represented that he was a highly successful recording artist signed to WMG; that he had achieved considerable success as a songwriter and had obtained a lucrative publishing agreement with Warner Chappell, WMG's publishing affiliate; and that he frequently toured and appeared as a headliner at concerts and other live performance events. White also advised Halpern and Lily that he had extensive experience as a record producer and that he would be able to provide valuable services in that capacity to Lily through the production of recordings featuring Lily's performances.

13.     After further discussions between Halpern, Lily and White, in or about April of 2012, White was engaged to produce the contemplated recordings for Lily.

14.     During the period April – September of 2012, Lily and White collaborated in authoring a number of compositions and, with White acting as producer, Lily ultimately recorded twelve additional compositions, including those that she had co-authored with White. White was paid approximately $140,000 for his services as producer, which Halpern funded as an investment in his daughter Lily's career.

15.     In or about May or June of 2012, while the production of Lily's recordings was ongoing, Halpern and Lily discovered that Patterson had been taking undisclosed payments, in effect "kickbacks," from certain third parties who were providing services on Lily's behalf, and was otherwise acting improperly and unethically in connection with her activities ostensibly on

Lily's behalf. As a result, in or about June of 2012, while Lily was in the midst of working with White on her new recordings, Lily terminated Patterson.

16.    As a result of Patterson's termination, Lily needed an individual with experience in the music business to help guide and further her career, including the completion of the recordings on which she was then working.

17.    As White had been working with Lily, both in collaborating in the authorship of compositions and in the production of her recordings, White was fully aware of Patterson's improper conduct; that Lily and Halpern had terminated Patterson; and of Lily's need for an experienced advisor to guide and further her career. White was also aware that Halpern was a highly successful investor who possessed substantial financial resources and was dedicated to supporting his daughter's professional endeavors.

18.    As alleged above, by September of 2012, Lily and White had completed the production of her new recordings; White had been paid approximately $140,000 for his services; and, unless White was able to persuade Halpern to expand the scope of their relationship, White would not be receiving any further funds from Halpern.

19.    As such, and hoping to obtain further funds from Halpern, White represented to Halpern and Lily that the twelve recordings that Lily had completed were not sufficient to assist her in securing a recording contract, and that it would be advisable for Lily to record, in the aggregate, approximately 30 songs. Upon information and belief, White did not make these representations in a good faith effort to further Lily's career, but, rather, in the hope that he might induce Halpern to pay White substantial additional sums to produce those recordings. Halpern, however, declined White's suggestion and did not engage him to produce any additional recordings for Lily.

20.    Upon information and belief, at this time, White - - hoping to capitalize on Lily's immediate need for a key advisor and to obtain additional funds from Halpern and exploit Halpern's financial resources and desire to assist his daughter - - conceptualized a scheme and artifice to defraud Halpern into advancing substantial funds to White, initially ostensibly on Lily's behalf and subsequently, as the parties' relationship developed, on White's behalf, a significant portion of which White ultimately used and diverted to his own benefit.

21.    In this regard, in September of 2012, just as the recording process was being completed and Halpern had declined to engage White to produce additional recordings for Lily, White proposed to Halpern that, assuming appropriate business terms could be reached, he serve as Lily's "coach" and "mentor" in the music business, and he committed to do "more for her than any manager."

22.    In making these overtures to Halpern, White repeatedly dropped the names of individuals in the music industry with whom he claimed close affiliation, including Mr. Cohen of WMG; Len Blavatnik - - the billionaire Russian investor who owns WMG; Scooter Weintraub, an extremely experienced music industry veteran who is closely affiliated with major recording artists including Eric Clapton and Sheryl Crow; and a number of other highly-regarded and well-connected individuals in the industry.  Indeed, as his discussions with Halpern continued in September of 2012, White specifically represented to Halpern that, if he was engaged on Lily's behalf, he would perform services for Lily "similar to what Sheryl Crow was for me when I was her opener."

23.    During the course of the parties' discussions, White committed to working "every day" to further Lily's career and described in some detail the nature of the services that he would perform on her behalf, including guiding the release of her contemplated record album; obtaining

live performance opportunities for her; assembling a group of musicians to back-up her live performances; licensing her compositions for use on television; developing her presence online; obtaining publicity for Lily, including on MTV.com, VH1 and "the good blogs and some cool music magazines"; and otherwise implementing a comprehensive strategy to further and advance her career. In "selling" his services to Halpern, White represented that as an "artist I can have the inside view from radio people and promo people about which [of Lily's] songs will go," and assured Halpern that he would "work 24 hours a day . . . " on Lily's behalf.

24.     White correctly recognized that Halpern - - who, as noted above, is a successful investor with substantial financial resources - - would go to great lengths to further his daughter's career. As such, White suggested - - in conjunction with and as a condition of fully committing to work on Lily's behalf - - that he and Halpern create a joint venture through which White would not only represent Lily, but would pursue other activities in the entertainment industry as well, including the furtherance of White's career and the "signing" of other developing artists to the venture.

25.     In inducing Halpern to create and fund this proposed venture, in September of 2012 (and continuing thereafter), White made specific and repeated representations to Halpern concerning White's supposed knowledge, experience and contacts in the entertainment industry; his purported past success as a recording artist, songwriter and live performer and the substantial revenues that in the past had been, and in the future would be generated from his professional activities; and his own allegedly substantial independent financial resources.

26.     Touting his supposed ability to locate and "sign" other recording artists, White also represented to Halpern at or about this time that "im sure i can get artists who can sell 100k albums" to join the venture. As White recognized that Halpern's principal objective in a possible

affiliation with White was the furtherance of Lily's career, White, as a continuing inducement to Halpern, repeatedly assured Halpern that Lily would be the primary focus of White's attention.

27.     Halpern responded to White's overtures by requesting in September of 2012 (and repeatedly thereafter) that White provide him with financial and related information concerning the contemplated venture, including "financial *pro formas*" that reflected "for the next twelve months, by month, how much . . . you [are] going to need"; the venture's anticipated operating expenses; and the projected revenues and expenses "for the second and third year" of the venture.

28.     In response, in October of 2012, White provided Halpern with further information concerning White's alleged success as a recording artist, including specific information regarding "downloads" of White's recordings and other details concerning his allegedly successful career as a songwriter and recording artist.  White also sent Halpern a budget for managing Lily's career for the first year of the venture, assuring Halpern that "I am OCD about budgets."  Once again exploiting his awareness that Halpern's principal interest in participating in the contemplated venture was to further Lily's career, White repeatedly assured Halpern that Lily would be the focus of his activities, and specifically represented that "im going to essentially manage her.  So everything from helping her w band, booking, oversee PR, help her w performance, cleaning up youtube and online stuff.  really as much as i can do."

29.     During September and October of 2012, White continued to make specific representations to Halpern about the significant revenues that the contemplated venture would generate and, to confirm his supposed commitment, White initially offered to contribute a substantial portion of his anticipated future entertainment-based revenues to the venture.

30.     In this regard, in October of 2012, White informed Halpern that if, as he expected, his recording of a composition he had written entitled "Love and Affection" goes "top ten," that would generate "around 4mm in writers royalty," which White offered to "split with 'our company.'" At the same time, White represented to Halpern that the licensing of one of his recordings of a song he had written for use in a "Panasonic commercial" would generate an additional "1mm plus."

31.     During the course of the parties' discussions, White advised Halpern that, in order for the venture to reach its full financial potential, White would have to acquire from WMG the most recent album he had recorded for that company (the "M. White Album"). In fact, the M. White Album had not yet been finalized, and White hoped to obtain from Halpern the funds necessary to complete production of the M. White Album. Accordingly, White proposed to Halpern that a certain portion of the funds that Halpern would be investing in the venture be used for that purpose and to promote and market that album. To assure Halpern that White would, indeed, be able to acquire the M. White Album from WMG, White again represented to Halpern that he was extremely "close" with both Mr. Cohen and Leonard Blavatnik, the billionaire Russian businessman who owns WMG.

32.     In or about November of 2012, Halpern and White reached a basic understanding concerning the general structure and purposes of the contemplated joint venture, i.e., through the venture, White would manage and guide Lily's career and Halpern would advance funds for that purpose, including for the release and promotion of Lily's contemplated album; the venture would also support and further White's career (including the acquisition from WMG of the M. White album) and, through White's efforts, would also "sign" other songwriters and recording artists, and Halpern and White would jointly fund those activities; and the revenues earned by the

venture, including the revenues that White assured Halpern would be generated from the exploitation of the M. White Album, would be used to repay the parties' investment and thereafter, the venture's profits would be split evenly between White and Halpern.

33.     The parties continued their discussions regarding their joint venture during November and into December of 2012. In the course of their discussions, White made further specific representations to Halpern concerning White's connections and experience in the music industry and his supposed substantial financial resources, including the significant amounts that White represented had been and were being generated from White's activities as a songwriter and recording artist and from his touring activities.

34.     In order to persuade Halpern that his investment in the venture would be secure, and that White was equally committed to the venture, in or about November of 2012, White confirmed his willingness to invest a substantial amount of his own funds into the venture. Specifically, White advised Halpern that he was going to receive a $300,000 publishing advance from Warner Chappell in the near future and that he would invest that amount, together with an additional $200,000, in the venture.

35.     White subsequently modified the structure of his intended investment in the venture, advising Halpern "that I have two major points on the board with bachelor and leno" - - a reference to White's "Love and Affection" composition/recording, which, he claimed, was to be featured on those television programs - - and that if you "add [another expected use of that recording] into the formula, this song can generate 5mm dollars, so for me to share that while bearing financial responsibility in the initial investment doesn't make sense to me." As such, and once again representing to Halpern that his professional activities would be generating

substantial, seven-figure amounts in the near term, White offered to contribute fifty percent (50%) of those revenues to the venture in lieu of an upfront investment.

36.    White remained fully aware that the most significant inducement for Halpern to invest in the venture was his desire to further Lily's career.  As such, White repeatedly confirmed his intention to work tirelessly on Lily's behalf.  In that regard, and at Halpern's request, in late November of 2012, White provided Halpern with a budget reflecting the funds that he claimed would be required to adequately advance Lily's career over the next year, which totaled approximately $125,000.  In order to lend some weight and credibility to this purported budget, and make it appear to Halpern that White had a staff and a functioning business operation, White advised Halpern that he had "my interns work through the weekend" on the budget.

37.    Contemporaneously with his assurances of his commitment to Lily, White continued to induce Halpern to invest in White's career, advising Halpern that White could acquire the rights to the M. White Album from WMG for $100,000, and then complete and successfully release, promote and market that album for an additional $125,000.  During the course of these discussions, White represented to Halpern that, if Halpern would fund the acquisition of the M. White Album, White would contribute to the venture all of the substantial revenues that White claimed would be generated from the exploitation of that album, together with a substantial portion of the publishing revenues that would be generated from the compositions embodied on the album.  White assured Halpern that, through this mechanism, Halpern would promptly recoup his investment and, thereafter, receive an attractive return on that investment.

38.    In making these representations to Halpern, White specifically advised Halpern that White recently had met personally with Len Blavatnik, the owner of WMG and that, based

12

on White's alleged close relationship with him, Mr. Blavatnik had readily agreed that White could acquire the M. White Album from WMG.

39.    To provide yet further assurances to Halpern regarding the financial resources that would be available to support the parties' venture, White advised Halpern that he was wealthy, offering "i am a private school kid from NY who grew up very spoiled, so in reality i dont have to work and never had to work, like my little sister who has four houses and goes between them every season. but i do music to win, and i do it bc I love it and really cannot live without it."

40.    In or about late November of 2012, White proffered further, detailed proposals for the parties' venture.  In this regard, based on the budget that White previously had provided to Halpern in respect of Lily's career, including the release and marketing of her album, White proposed that Halpern invest $125,000 for that component of the venture's activities (the "Lily Funding").  At the same time, White proposed that Halpern invest an additional $375,000 in the venture (the "White Funding"), both to fund the acquisition, completion, release and promotion of the M. White Album and otherwise further White's career and to provide operating funds for the venture and funding for the signing of other writers and recording artists.

41.    During the course of the parties' discussions, Halpern requested assurances that his anticipated investment would be repaid and was otherwise secure.  In response to Halpern's queries, in November of 2012, White represented to Halpern that "i have the vh1 mtv, radio support always, can always tour," *i.e.*, that White had the ability to generate substantial revenues from his own career that would provide security for Halpern's investment.

42.    In yet a further effort to assuage Halpern's expressed concerns regarding his contemplated investment, and in response to Halpern's request, in late November of 2012, White sent Halpern information regarding White's alleged income generated from his touring activities

and the exploitation of his compositions.  At the same time, and fully cognizant that Halpern's main concern was the furtherance of Lily's career, White consistently represented to Halpern that White was fully committed to working diligently on Lily's behalf.

43.    During the course of the parties' discussions, Halpern repeatedly confirmed his desire that the parties' venture engage an accountant or a business manager experienced in entertainment industry practices to oversee the financial functions of the venture.  White readily concurred in Halpern's expressed desire, and committed that, once the venture was formalized, White would engage a well-established business manager, whom White identified, to handle the venture's financial functions (the "designated business manager").

44.    During November and December of 2012, while the parties' discussions continued, White requested certain funds from Halpern, which White represented were needed and would be used solely to further Lily's career.  In making this request, White assured Halpern that the two would soon be entering into a formal written joint venture agreement and that Halpern's advance of a portion of the Lily Funding, and White's responsibilities in respect of that funding, would be memorialized in that agreement.  In reliance on White's representations, in December of 2012, Halpern advanced $50,000 to White, for the express and sole purpose of furthering Lily's professional activities.

45.    In or about December of 2012, Halpern requested that White send him additional financial information, including specific information regarding the "earning power" of the M. White Album, so that Halpern could determine whether White's proposal regarding the White Funding, including the use of a portion thereof to acquire that album from WMG, was financially justified.  In response, White advised Halpern that he was assembling the requested information and that he would promptly forward the same to Halpern.

46.    In explicit confirmation of the nature of the parties' relationship, in December of 2012, White began referring to Halpern as his "partner" and, in that capacity, he requested that Halpern advance certain funds to White that White represented he required so that his recording of "Love and Affection" would be selected for use on the reality television show *The Bachelor*. In inducing Halpern to provide these requested funds, and, more generally, to commit to invest the aggregate amount of $375,000 in contemplated White Funding, White specifically represented to Halpern that, if "Love and Affection" was featured on *The Bachelor*, "it will probably sell 1mm downloads" and that the mechanical royalties that would be generated as a result will "be in the 7 figures," *i.e.*, in excess of $1,000,000.

47.    In the midst of these discussions, Halpern again made inquiry concerning the engagement of a business manager or accountant to handle the joint venture's financial affairs. In response, White repeatedly assured Halpern that he had been in contact with the designated business manager, and that this individual was both willing and more than capable of performing the financial and accounting functions that Halpern was requesting.

48.    In performing further financial due diligence regarding the contemplated venture, in December of 2012, Halpern requested additional information from White concerning the revenues that were generated from White's activities in the music business, as a substantial portion of those revenues was to be assigned to the joint venture. In response, White represented to Halpern that he had "made over a million dollars a year since 2005," and again assured Halpern that, based on White's earning power and his experience in the music business, Halpern's "investment is going to be making money off the bat."

49.    In January of 2013, Halpern made further inquiry of White concerning the engagement of the designated business manager whom White repeatedly had recommended.

White assured Halpern that White had communicated with the designated business manager and that he would direct all proceeds received by or on behalf of the parties' venture to the business manager.

50.    At or about the same time, *i.e.*, in late January of 2013, in response to Halpern's further inquiries regarding the mechanism for the repayment of Halpern's investment of the $375,000 White Funding, White agreed to contribute a substantial portion of his recording, publishing and touring revenues to the parties' venture. In response to Halpern's specific inquiry as to how long it would take for Halpern to recoup that investment, White replied "I Dont think it would be outside of a year." To assuage any lingering concerns that Halpern might have, White advised Halpern that, if Halpern had not recouped his investment within that one year period, White would use certain publishing income that he would be receiving - - which he repeatedly represented to Halpern was substantial - - to repay Halpern, because "i want that principle [*sic*] paid back as soon as possible."

51.    By the end of January of 2013, Halpern and White had agreed upon the material terms of their joint venture and White, acting on behalf of the venture, retained an attorney to memorialize the parties' accord in a written agreement. At the same time, White again assured Halpern that he was in the process of engaging the designated business manager to handle the venture's financial and accounting functions.

52.    In reliance of White's repeated representations regarding the venture and the security of Halpern's investment, as summarized above, in late January of 2013, Halpern advanced $100,000 to White, which White committed to use for the acquisition of the M. White Album from WMG.

53.     With Halpern's investment in the venture increasing, during February of 2013, Halpern sought assurances from White that he had both the time and the infrastructure necessary both to further Lily's career and pursue the other components of the parties' venture. White responded by assuring Halpern that he did, and by advising Halpern that his "office is working nonstop on [the venture]" and that White was pursuing a recording artist and composer to sign with the venture who had written a song that, White represented, would generate "a few million a year."

54.     At or about this time, Halpern also expressed concern to White about White's ability to properly and responsibly handle the financial aspects of the venture. In response, White assured Halpern that White possessed the willingness, ability and infrastructure necessary to do so.

55.     In late February and early March of 2013, while the venture's attorney was preparing the formal contract memorializing the parties' accord, Halpern emphasized to White the importance of having appropriate accounting and financial systems in place. In response, White concurred and assured Halpern "that I am doing everything in a trustworthy way" and that he would "get everything going with [the designated business manager] this week."

56.     At this time, with the material terms of the parties' joint venture agreed to, and while the attorney that White had retained on the venture's behalf was preparing a written agreement memorializing the parties' accord, White pressed Halpern to provide additional funding to the venture. In response, Halpern expressed some concerns regarding the venture and White's ability to properly perform his functions and responsibilities to the venture. Purposefully manipulating Halpern's commitment to his daughter, White responded to Halpern's expressed hesitance by suggesting that, perhaps, he might not have the "time and energy" to

work on Lily's behalf. Concerned that White's willingness to work on Lily's behalf might be wavering, in early March of 2013, Halpern advanced an additional $12,500 to White.

57.    As of March of 2013, based on White's repeated and specific representations, Halpern believed the parties' venture was proceeding in conformance with the parties' agreement; that White was properly managing Lily's career in anticipation of the release of her album; that White was furthering his own career, including the acquisition of the M. White Album from WMG and, at the same time, was pursuing new artists to sign to the venture; and that he was finalizing the engagement of the designated business manager to handle the financial functions of the venture's business.

58.    In late March of 2013, at White's request, Halpern advanced additional funds to the benefit of the venture as part of the White Funding.

59.    By March of 2013, Halpern had advanced $50,000 of the $125,000 Lily Funding and approximately $120,000 of the $375,000 White Funding to White on behalf and solely for the benefit of the venture. In response to Halpern's inquiry, White assured Halpern that all of the venture's revenues were "being isolated for recoupment" of Halpern's investment.

60.    Later in March of 2013, Halpern made inquiry concerning the status of the written contract memorializing the parties' joint venture agreement and, as well, of White's engagement of the designated business manager. White responded by assuring Halpern that he was "riding" the attorney to get the agreement prepared and by advising Halpern that the designated business manager was simply waiting for the venture's attorney to finalize the parties' agreement, at which time the business manager would formally establish the venture as an LLC and otherwise assume responsibility for the venture's financial functions.

61.     In or about mid-late March, the attorney representing the venture provided a draft joint venture agreement to White and Halpern.  Over the next several weeks, White and Halpern provided comments to the draft agreement, which the venture's attorney revised.

62.     During the course of their discussions concerning the written joint venture agreement, Halpern again asked White for assurances regarding the recoupment of his payment of the White Funding.

63.     White responded by again assuring Halpern that his investment was safe and would be promptly repaid.  In that regard, White specifically advised Halpern that he expected Halpern's investment to be recouped from downloads of White's recordings and funds that White would be receiving from ASCAP for the public performance of his compositions.  To provide yet further assurances to Halpern regarding the security of his investment, White represented that, in the "worst case scenario," White would embark on a live performance tour which would allow him to "make back [the] principle [*sic*]" that Halpern had invested in the venture.  Based on White's specific and repeated representations concerning the amounts that would be generated from the revenue streams that White was assigning to the venture, Halpern believed that his investment was secure and would be promptly repaid.

64.     In the context of the parties' efforts to finalize their written joint venture agreement, Halpern requested yet additional financial information from White so that he could be further assured that his investment would be secure.  In response, in late March of 2013, White made specific representations to Halpern concerning the income that he had received in the past three years from certain of his publishing activities, *i.e.*, "500k, 300k and 300k roughly"; advised Halpern that, through White's recording activities while signed to WMG, that entity had "brought in well over 1 million" on an album that White had recorded, despite White's

19

characterizations of that album as "unsuccessful . . . in terms of [his] career"; informed Halpern that WMG had received approximately $475,000 from downloads of one "single" that White had released; and represented that, through White's assignment of a significant portion of his music industry revenues to the joint venture, and the income that would be generated from the other activities that White would be pursuing on behalf of the venture, Halpern would not only recoup his investment in a short period of time, but would earn a significant return thereon.

65.    In late March of 2013, at the same time that he was providing these assurances to Halpern, White confirmed to Halpern that he was continuing to communicate with the designated business manager and that "we are going to set up accounts w [the business manager] moving forward . . . ." On April 4, 2013, White represented to Halpern that the designated business manager "is going to set us up tomorrow and incorporate [the venture] and make sure money post jan 2013 is deposited into [the venture]."

66.    Shortly thereafter, Halpern made further inquiry concerning the status of the venture, the engagement of the designated business manager and the manner in which the venture's funds would be handled.  Purposefully diverting attention from Halpern's inquiry to the area that White knew was of central importance to Halpern, *i.e.*, his daughter, White advised Halpern of the significant steps that White was purportedly taking to further Lily's career.

67.    Virtually immediately following this exchange, White requested that Halpern advance an additional approximately $80,000 to the venture, for "operating capital."  In making this request, White assured Halpern that "There will always be full transparency with what we do."

68.    On or about April 10, 2013, in reliance on White's aforesaid representations, Halpern advanced an additional $80,168 to the venture.

69.     At or about this time, White advised Halpern that he had recently completed the acquisition of the rights to the M. White Album from WMG, including his recording of his composition "Love and Affection," and that he intended "to exploit that song worldwide" as a means of generating substantial revenue for the parties' venture.

70.     In late April of 2013, the written agreement memorializing the parties' joint venture (the "Joint Venture Agreement") was finalized, and Halpern and White executed the same.  The Joint Venture Agreement, which confirmed that the venture would conduct business as "Bleecker Street Music," provided, *inter alia*, that:

(a)     Bleecker Street would further the development of White's activities in the entertainment industry and those of other recording artists and songwriters, including Lily;

(b)     Bleecker Street would be owned equally by White and Halpern;

(c)     As soon as practicable, the parties would establish a formal co-owned legal entity through which Bleecker Street would be operated;

(d)     White's services in the entertainment industry (with certain limited exceptions) would be exclusive to the Bleecker Street venture and the venture would own the copyrights (and other rights) in White's recordings and the other results and proceeds of his entertainment-related services (with the exception of the copyrights in his musical compositions);

(e)     Halpern would make capital contributions to the venture of not less than $505,000, which would be allocated as follows:  the $125,000 Lily Funding would be used for Lily's career, including the development, recording, release, promotion and marketing of Lily's contemplated album; $100,000 of the White Funding would be used to acquire from WMG the ownership and control of the M. White Album, which White assigned to the venture; $80,000 of

the White Funding would be used to promote and otherwise support the M. White Album; and the balance of Halpern's capital contribution would be used to, *inter alia*, fund the venture's operations and for related purposes as set forth in the Joint Venture Agreement;

      (f)    White could not terminate the Joint Venture Agreement until Halpern had received 120% of the amount of the White Funding, and White was obligated to pay 100% of all gross revenues derived from his recordings and fifty percent (50%) of his publishing royalties and 50% of the gross revenues derived from his other non-recording activities in the entertainment industry to Halpern until the White Funding had been fully repaid to Halpern and, thereafter, the venture's revenues would be allocated evenly between White and Halpern; and

      (g)    White would use his best efforts during the term of the Joint Venture Agreement to further his career and maximize the earnings generated therefrom.

    71.    Within days of the parties' execution of the Joint Venture Agreement, Halpern once again requested that White formally engage the designated business manager to handle the financial functions of the venture and, as well, to establish a formal business entity through which Bleecker Street would operate. White responded to Halpern's overtures by repeatedly assuring him that he would promptly attend to those tasks.

    72.    Upon information and belief, notwithstanding his contrary representations to Halpern, White was concerned that the venture's engagement of an experienced business manager would frustrate White's planned conversion and diversion of Halpern's investment and the venture's revenues. Accordingly, in or about April of 2013, White suggested to Halpern that they wait to formally retain a business manager since, in White's expressed view, until the venture began to receive regular revenues, it would not be cost-effective for it to engage a business manager. White proffered these suggestions not in a legitimate effort to protect the

interests of Halpern and the venture, but, rather, to further his scheme and artifice to defraud Halpern and the venture and to avoid having an independent financial advisor uncover what later proved to be White's substantial financial defalcations.

73.    When Halpern protested that an independent financial advisor was necessary to the proper functioning of the venture, White replied that, despite his judgment that it was not worth the expense, he would move decisively to formally engage the designated business manager.  In response to Halpern's specific inquiries, in early May of 2013, White represented to Halpern that he had just spoken to the designated business manager, who had committed "to start once we got up and running."

74.    In May of 2013, to induce Halpern to make further advances to the venture, White averred that he needed additional funds to promote his "Love and Affection" recording on radio, representing to Halpern that "we could at the end of the day have a 10mm copyright.  And if it goes top 3 15 mm," *i.e.*, White represented to Halpern, who was not experienced in or familiar with music industry practices, that White's recording/composition "Love and Affection" might well generate between $10,000,000 - $15,000,000 in revenues.

75.    To further induce Halpern to advance additional funds to the venture, White also represented to Halpern in May of 2013 that White would be receiving a substantial advance from his publisher, Warner Chappell, in early September of 2013 and that he would immediately "recapitalize," *i.e.*,  repay to the venture (and thus to Halpern), $75,000 from that advance. White made these representations for the specific purpose of providing assurances to Halpern that Halpern's present and contemplated future investment in Bleecker Street was safe and that White would personally be funding a significant portion of the repayment of Halpern's investment from monies that he claimed he was assured of receiving in the near future.

76.    By June of 2013, Halpern had advanced to the venture $75,000 of the $125,000 Lily Funding, which was to be used in furtherance of Lily's career; and the entirety of the $375,000 White Funding, which was to be used to further White's career and, as well, the more general objectives of the venture, including the signing of other recording artists and songwriters.

77.    During this period of time, Halpern raised a number of questions concerning White's expenditure of the funds Halpern had advanced and the direction in which the venture was heading. In response, and cognizant that Halpern's most fundamental motivation was to further Lily's career, White replied by advising Halpern of all that White allegedly was doing to advance Lily's interests.

78.    During June – July of 2013, Halpern repeatedly sought confirmation from White that he had engaged the designated business manager to oversee the financial functions of the venture. White assured Halpern that he was in frequent contact with the designated business manager, who was in the process of assuming the role for the venture that Halpern had requested.

79.    By August of 2013, Halpern had advanced, in the aggregate, approximately $475,000 to Bleecker Street. However, according to White, the venture had not yet received any income. In response to Halpern's expression of concern about the venture's lack of revenue, White advised him that there was a natural ramp-up time for the receipt of royalties and similar income streams in the music business and assured him that the venture would generate and receive substantial revenues in the near future, principally from White's professional activities.

80.    In that regard, on August 12, 2013, White represented to Halpern that his recording of "Love and Affection" had sold in excess of 40,000 singles and had been streamed some 700,000 times which, White assured Halpern, would generate significant monetary benefit for the venture.

81.    At the same time, White continued to assure Halpern that the services he was providing for Lily were beginning to show positive results and that he was working diligently to position her for the successful release of her contemplated album and the further development of her career.

82.    In September of 2013, Halpern once again expressed concern regarding the financial performance of the venture and White's apparent failure to implement accounting and related functions. In response, White explained the venture's lack of financial reporting capability by claiming that the individual who was allegedly assisting him in implementing those functions had "become totally unreliable." As to the venture's financial performance, White represented to Halpern that at least $100,000 would soon be received by the venture from the exploitation of "Love and Affection" on the TV reality show *The Bachelorette*; and White promised Halpern that, in addition, he would provide $100,000 from his advance from his publisher, Warner Chappell, to the venture.

83.    By September of 2013, Halpern had provided all of the Lily Funding and the White Funding to White. Upon information and belief, White, who had now induced Halpern to make those payments to White, had expended all, or a substantial portion of those funds and, unbeknownst to Halpern at the time, was facing financial pressures unrelated to the venture. Upon information and belief, White thus modified and expanded his scheme and artifice to defraud Halpern by devising a mechanism to obtain yet further funds from Halpern, as is further alleged below.

84.    As alleged earlier herein, and as confirmed both in contemporaneous e-mail communications and in the parties' Joint Venture Agreement, one of the essential functions and roles that White assumed in the venture was to manage, guide and advance Lily's career.

Notwithstanding that fact, in late September of 2013, White advised Halpern that, as he was devoting substantial time to that task, he felt it was appropriate that he be paid, in addition to the $125,000 in Lily Funding that Halpern had already advanced to the venture, $2,500 a month "to cover my workload." In making this request, White assured Halpern that Halpern's $500,000 investment in the venture was safe, as the venture would soon be receiving substantial amounts of money from a variety of projects that White was working on.

85.     Based on White's specific representations concerning the financial performance of the venture, and Halpern's desire to incentivize White to further Lily's career, in or about September of 2013, Halpern agreed that White would receive an additional $2,500 a month for the services that White allegedly was providing on Lily's behalf.

86.     Under the construct that Halpern and White initially discussed at this time, the $2,500 monthly payment would be paid from the income that White assured Halpern would soon be received by the venture. In October of 2013, however, White requested that Halpern make the additional $2,500 monthly payments to White. When Halpern protested that White had previously agreed that the monthly payment would be paid from the venture's revenues, White advised Halpern that he had made nearly $1,000,000 from a prior commercial that used one of his recordings, and he assured Halpern that substantial revenues from further exploitations of that recording had been earned and would soon be received by the venture.

87.     In reliance on White's specific representations, Halpern began to remit to White the additional $2,500 monthly payment that he had requested to perform the responsibilities that he had previously agreed to assume on Lily's behalf.

88.     In October of 2013, Halpern requested information concerning the joint venture's bank account and confirmation that the designated business manager was handling the venture's

financial affairs.  White assured Halpern that he would send the requested bank information and that, while he was "still waiting to hear from" the designated business manager, he had communicated with two other potential business managers as well, and would engage one of these individuals in the immediate future.

89.    At the same time that he was pressing White to finally engage a business manager for the venture, Halpern also requested an update concerning the formal establishment of a corporate or other business entity through which the venture would operate.  In November of 2013, White advised Halpern that a limited liability company or "LLC" was being established and would "be registered by end of next week," and that, immediately following the registration of the LLC, the designated business manager would be formally engaged and bank accounts for the LLC opened.

90.    Upon information and belief, Bleecker Street was finally formed as a New York limited liability company in or about December of 2013, although White did not engage the designated business manager, or, upon information and belief, establish separate bank accounts for the venture.

91.    In or about December of 2013, with the intention of inducing Halpern to advance yet more funds that would benefit White, White attempted to persuade Halpern to invest $1,000,000 in a different music industry venture, this one located in Boston, Massachusetts, named "ThinkSay."  White made numerous representations to Halpern concerning the benefits that investing in that entity would have for both Halpern and the parties' venture, including in furthering Lily's career.

92.    Upon information and belief, White made these overtures to Halpern not for Halpern's benefit or for the benefit of the Bleecker Street venture, but as a means of extracting

yet further investment funds from Halpern that would be used for White's own purposes in furtherance of his own interests.

93.     In discussing the ThinkSay investment with White in December of 2013, Halpern expressed concern regarding the substantial investment that he had already made in the parties' venture and his reluctance to commit yet further funds to a White-related investment before his advances to the joint venture had been repaid.  White responded to Halpern's observations by offering that "if I have to guarantee your money by putting up one of my homes I'll do that . . . We have a song [Love and Affection] that is a hit without any radio.  It can sell 3 million more songs and become a massive worldwide hit."

94.     To provide yet further assurances to Halpern regarding the security of his investment in the parties' venture, in December of 2013, White offered to sell one of the houses that he claimed he owned to generate funds to repay Halpern for the $375,000 White Funding. In the alternative, White advised Halpern he would repay that amount with royalties and other income that White represented were being generated from the exploitation of his musical works.

95.     To further assuage Halpern's expressed concerns as White continued to urge Halpern to make a $1,000,000 investment in ThinkSay, on December 19, 2013, White specifically represented to Halpern that "I just think by the time summer rolls around there will be a significant amount of money coming To you.  So whatever u decide I can either cut you a check for the remaining balance [of Halpern's investment of the White Funding in the venture] or collect those royalties."

96.     In late December of 2013, Halpern requested that White prepare an accounting, with appropriate back-up documentation, regarding the venture's expenditures of the funds that Halpern had invested and the revenues that it had received.  After dissembling and making

various excuses, on or about December 20, 2013, White made available to Halpern a disorganized pile of certain receipts and similar paperwork that shed no significant light on the financial affairs of the venture.

97.     When Halpern, through one of his advisors, expressed significant concern regarding the disorganized materials that White had proffered, White replied that "I recognize that i am not the best with accounting.  I will have everything straightened up and easily accessible for you in the next few weeks."

98.     White's failure to provide the requested accounting and back-up documentation only increased and exacerbated Halpern's concerns regarding the operation of the venture and White's use of the substantial funds that Halpern had advanced.  Halpern raised these concerns with White in late December of 2013.  In response, White advised Halpern that he owned two homes, one in Sag Harbor, New York and the other in the Hollywood Hills section of Los Angeles, California.  White advised Halpern that he would be willing to sell the house he claimed he owned in California to repay Halpern for the White Funding.  To confirm to Halpern the value of White's offer, in December of 2013, White provided Halpern with the address of this residential property.

99.     Halpern made inquiry regarding the properties that White claimed he owned and he discovered that not only had White overstated the value of the California property, but that the address that White had provided for the Sag Harbor property did not exist and that White was not the owner of record of the California property.  When Halpern confronted White with these disturbing facts, White advised Halpern that, while White was in actuality a co-owner of the California property, he had transferred title out of his name for personal reasons, and that the

issue with the address he had provided for the Sag Harbor property was the result of construction that was being performed on the property.

100.    At or around this time, while he continued to press Halpern to make a substantial investment in ThinkSay, and in the response to what White correctly perceived as Halpern's growing concerns, White, to further assure Halpern that his substantial investment in the parties' venture was safe, agreed to "personally guarantee that you get back the 375k no matter what happens."

101.    During January of 2014, Halpern continued to pressure White for further information regarding the venture's finances and, as well, assurances regarding the repayment of the $375,000 White Funding that he had advanced to the venture.  In response, White promised Halpern that if he was not fully recouped by August of 2015, White would assign certain substantial royalties that he was due to Halpern "or pay you from my own pocket."

102.    Sensing that Halpern was growing increasingly hesitant to invest in ThinkSay, in January of 2014, White assured Halpern that no matter what might transpire, Halpern would be paid back the full $375,000 in White Funding that he had advanced to the venture, offering that "more than likely I will sell one of my houses and can just cut you a check for 375k from that." White further represented that, even after Halpern had been repaid, he and White would still split the substantial royalties, license fees and other amounts that White continued to assure Halpern would be generated from the M. White Album.

103.    Recognizing that he had already invested more than $500,000 in the parties' venture and had not received any recoupment thereof, and growing increasingly concerned about White's conduct, Halpern declined to invest in ThinkSay and he so advised White in or about late January of 2014.  White expressed his extreme displeasure to Halpern in the face of

Halpern's refusal, which only further increased the strain between Halpern and White and exacerbated Halpern's already significant concerns about White.

104.    In the face of, *inter alia*, White's prior evasions and his dubious claims regarding the California and Sag Harbor residences, by late January of 2014, Halpern had grown extremely concerned regarding White's veracity, competence and ability to properly operate the parties' venture.  At the same time, however, Halpern was concerned that immediately severing his relationship with White might be detrimental to Lily's career, as White had assured Lily and Halpern that her album would soon be released, and Halpern did not want to derail that process. In fact, in January of 2014, a so-called EP featuring four of Lily's recordings was released on Apple's iTunes.

105.    As a result of these apparent developments in Lily's career, Halpern did not immediately terminate his relationship with White at this time.  However, Halpern began to more forcefully press White for financial information and the implementation of appropriate accounting and related functions for the parties' venture.  In response, White repeatedly assured Halpern that he would act in accordance with Halpern's requests, providing a number of excuses for why he had not previously done so.

106.    At or about this time, White was, upon information and belief, albeit unbeknownst to Halpern, facing yet further personal financial pressures unrelated to the venture. As a result, and having failed in his efforts to induce Halpern to invest in the ThinkSay venture and once again modifying and expanding his fraudulent scheme and artifice, White attempted to extract further funds from Halpern by manipulating Halpern's manifest desire to advance his daughter's career.  In this regard, White advised Halpern that attending to Lily's career was more time intensive than White had anticipated and that, in order to properly further Lily's career and

31

promote her just released EP recording, White would require $8,000 a month, rather than the $2,500 that Halpern had been paying him. Specifically, White advised Halpern that he was expending significant time and using his supposed industry contacts and other resources to further Lily's career, and that "7500 a month is what a janitor makes or a cab driver." White made these demands despite the fact that, under the parties' agreement, White had agreed to further Lily's career, including in respect of the release of her recordings, as a condition of Halpern's investment of in excess of $500,000 into the parties' venture.

107.    Halpern ultimately, albeit reluctantly, agreed to pay White $5000 a month to continue to manage Lily's career - - not because White was entitled to the same, but as Halpern was concerned that if he refused White's request, he would derail the promotion of Lily's EP and otherwise disrupt her developing career.

108.    At various times, White also requested certain additional funds from Halpern on Lily's behalf, which White explained were needed to pay music supervisors on certain television shows to help secure so-called synchronization licenses for the use of Lily's recordings on those shows. White advised Halpern that this was standard practice in the music business and that he would be unable to place those songs for use on television without the requested funds.

109.    In reliance on White's representations, in or about January of 2014, Halpern advanced the additional aggregate sum of $30,000 to White, ostensibly to fund White's efforts to secure licenses for the use of certain of Lily's recordings on television shows. In inducing Halpern to advance these additional funds, White assured Halpern that he would recoup the same from the amounts that would be generated from Lily's recordings after they were featured on television.

110.    Ultimately (in or about February of 2014), a recording by Lily of the composition "Nothin' But Trouble" was featured on two episodes of a teen drama television show.  Although Halpern paid White $30,000 to fund what Halpern believed was a legitimate expense to help place Lily's recordings on television shows, to date, upon information and belief, Lily has not received any income from the aforesaid uses of her recording.

111.    By the end of January of 2014, White still had not engaged the designated (or any other) business manager for the parties' venture.  When Halpern once again pressed the issue, White now advised Halpern that the designated business manager had been unresponsive to White's overtures and that White would seek alternative candidates for the position and would engage a business manager by the end of the week.

112.    At or about this time, Halpern again requested that White provide him with a full accounting of the venture's finances, a request that Halpern had repeatedly made in the past.  In response, White assured Halpern that, once the business manager had been engaged - - which White represented would be in the immediate future - - the business manager would prepare the accounting and provide the same to Halpern.

113.    Halpern's concerns about White were further increased when, in February of 2014, White sent Halpern a purported personal management agreement that White proposed be used to govern White's activities in managing and furthering Lily's career.  Upon review of this agreement, Halpern was shocked to discover that it was a boilerplate contract governed by Texas law concerning an individual who apparently was providing management services to a different artist in Texas.  In other words, White - - who repeatedly had touted his experience and expertise in the music industry - - sent an agreement to Halpern to govern White's relationship with Lily

that had been prepared for another personal manager who was providing services to a different individual in a different State.

114.    By mid-February of 2014, with Halpern's concerns increasing, he once again pressed White for the long-delayed accounting of the parties' venture. In response, White advised Halpern that he had prepared the accounting and was "just waiting on some invoices to complete what was spent." Notwithstanding these assurances, White failed to provide the promised accounting to Halpern.

115.    As a result of White's abject failings, including in respect of his inadequate "accounting," in February of 2014, Halpern suspended the $5,000 monthly additional payments that he had been providing to White, ostensibly for White's services in managing Lily's career.

116.    White responded by attempting to drive a "wedge" between Halpern and his daughter. Specifically, White made certain representations to Halpern critical of Lily and, contemporaneously, advised Lily that her father was impeding the development of her career. White made these contradictory, internally inconsistent and false statements to Halpern and Lily in an attempt to manipulate Lily and damage her relationship with her father.

117.    By late February of 2014, Halpern had still not received the requested accounting from White. In response to Halpern's further requests for the same, White once again assured Halpern that he had assembled much of the back-up documentation, but claimed that he was having trouble locating certain information on the venture's computers and was waiting for one of his employees to assist him in the process. White, however, once again failed to provide the requested accounting to Halpern - - even in the incomplete form that he claimed he had prepared.

118.    Desirous of obtaining the requested accounting, Halpern instructed one of his representatives, with financial and bookkeeping experience, to assist White in preparing and providing the requested accounting.

119.    Ultimately, even with the assistance of Halpern's representative, White produced an incomplete, unsubstantiated and utterly inadequate "accounting" of his expenditure of the more than $500,000 that Halpern had advanced to the venture.  When pressed to provide back-up documentation for his inadequate accounting, White failed to provide *any* documentation to support his use of the $125,000 in Lily Funding and provided supposed substantiation for only approximately $90,000 of the $375,000 of White Funding that he had received.

120.    By March of 2014, Halpern's relationship with White had seriously deteriorated as a result of White's dissembling and evasion; his failure to provide an adequate accounting; his failure to generate any significant revenues on behalf of the venture; and his other failings and defalcations.

121.    As a result of the foregoing and certain additional issues that arose between the parties, in late March of 2014, Halpern advised White that he wanted to terminate the parties' relationship.

122.    In the face of Halpern's decision, and recognizing that White would no longer be able to induce Halpern to advance any further funds to him, White became increasingly vituperative and, at times, nearly irrational.  As a result of all of the foregoing, Halpern decided to completely distance himself from White and the Bleecker Street venture, and so advised White.

123.    During the course of the parties' conversations regarding the termination of their relationship, White agreed to convert Halpern's $375,000 investment of the White Funding to a

loan, and to separate Halpern's financial interests in the venture from those of White. White, however, never followed through on his assurances and failed to enter into the promised loan/separation agreement.

124.    By April of 2014, Halpern and White had ceased communicating. Since that time, White has failed to provide Halpern with virtually any information concerning the activities, finances and operation of the venture.

125.    Unable to induce Halpern to provide him with any further funds, White no longer had the incentive or desire to work on Lily's behalf, and their relationship also ended in or about April of 2014. Lily is currently managed by a different individual and, under that individual's guidance and in contrast to White's deficient efforts on her behalf, her career is beginning to flourish.

126.    Halpern ultimately invested in excess of $530,000 in the parties' venture, including the $125,000 Lily Funding that White had agreed to use solely to further Lily's career and the $375,000 White Funding that White had agreed to use solely to further White's career and the more general objectives of the venture.

127.    As of the date of this Complaint, Halpern has not received any funds from White or Bleecker Street in recoupment of the substantial funds he advanced to the venture.

128.    White has never adequately or properly accounted to Halpern for the expenditure of funds that he purportedly made on Lily's behalf, on his own behalf, and otherwise in furtherance of the venture, and Halpern believes, and therefore avers, that White diverted to his own use and benefit a substantial amount of the funds that Halpern advanced to the venture.

129.    Since he severed ties with White in or about April of 2014, Halpern has become aware - - as is alleged with more particularity below - - that virtually every material

representation that White made to Halpern to induce Halpern to enter into the joint venture and, thereafter, to continue advancing funds to White and the venture, was false, fabricated, exaggerated, or otherwise without basis.  In this regard, albeit without limitation, White exaggerated and misrepresented his own past success in the music industry; the nature and extent of the contacts and relationships that he possesses in the industry; his past earnings, financial resources and future earning potential; and his ability to guide and advance Lily's career, manage the affairs of the venture, sign other artists to the venture and otherwise operate the venture in a manner consistent with his contractual and fiduciary obligations and the assurances that he repeatedly had provided to Halpern.

130.    White's misrepresentation, fabrication, exaggeration and obfuscation continued after he and Halpern entered into the venture, through the date on which Halpern severed his relationship with White.

131.    Most basically stated, and as alleged with more particularity below, White fraudulently induced Halpern to form and join the venture, to fund the venture and to enter into the Joint Venture Agreement; breached his fiduciary duties to Halpern while they were associated in the venture; acted in derogation of the parties' Joint Venture Agreement; converted substantial funds of Halpern to his own use and benefit; and engaged in other and further defalcations, all of which are actionable at law and all of which caused Halpern to suffer substantial monetary damages.

## COUNT I
(Fraudulent Inducement)

132.    Halpern hereby incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if set forth herein at length.

133.    As set forth above, White knowingly and intentionally made numerous misrepresentations of fact to Halpern prior to and in connection with Halpern's decisions to form, join and advance funds to the venture and to enter into the Joint Venture Agreement.

134.    The representations of White alleged earlier in this Complaint that are identified below were false and were known by White to be false at the time they were made:

    a.    Paragraph 25

    b.    Paragraph 26

    c.    Paragraph 28 – second sentence

    d.    Paragraph 29 – first sentence

    e.    Paragraph 30

    f.    Paragraph 33 – second sentence

    g.    Paragraph 35

    h.    Paragraph 37 – final sentence

    i.    Paragraph 41 – final sentence

    j.    Paragraph 43 – final sentence

    k.    Paragraph 46 – second sentence

    l.    Paragraph 47 – final sentence

    m.    Paragraph 48 – final sentence

    n.    Paragraph 49 – final sentence

    o.    Paragraph 50 – second, third sentences

    p.    Paragraph 51 – final sentence

    q.    Paragraph 54 – final sentence

    r.    Paragraph 55 – final sentence

s.    Paragraph 59 – final sentence

t.    Paragraph 60 – final sentence (re designated business manager)

u.    Paragraph 63 – first, second, third sentences

v.    Paragraph 65

w.    Paragraph 67 – final sentence

x.    Paragraph 71 – final sentence

y.    Paragraph 73

z.    Paragraph 74

aa.    Paragraph 78 – final sentence

bb.    Paragraph 84 – final sentence

cc.    Paragraph 86 – final sentence

dd.    Paragraph 88 – final sentence

ee.    Paragraph 89 – final sentence (re designated business manager)

ff.    Paragraph 93 – final sentence

gg.    Paragraph 95

hh.    Paragraph 101 – final sentence (re royalties)

ii.    Paragraph 102 – (re sale of house and expected royalties and other

income)

jj.    Paragraph 105 – final sentence

kk.    Paragraph 108 – final sentence

ll.    Paragraph 111 – final sentence

mm.    Paragraph 112 – final sentence

135.    Upon information and belief, the representations of White alleged earlier in this Complaint that are identified below were also false and were known by White to be false at the time they were made:

      a.      Paragraph 36 – final sentence

      b.      Paragraph 53 – first phrase/final sentence

      c.      Paragraph 64 – final sentence

      d.      Paragraph 75 – first sentence

      e.      Paragraph 79 – final sentence

      f.      Paragraph 80

      g.      Paragraph 82 – second and third sentences

      h.      Paragraph 91 – final sentence

      i.      Paragraph 94 – final sentence

      j.      Paragraph 109 – final sentence

136.    White made the foregoing misrepresentations to Halpern with the intent to defraud and deceive Halpern and induce him to act on them in reaching his decisions to form, join and advance funds to the venture and to enter into the Joint Venture Agreement.

137.    Halpern reasonably relied on White's misrepresentations in agreeing to form, join and advance funds to the venture and to enter into the Joint Venture Agreement.

138.    As a result of the foregoing, Halpern has been damaged in an amount to be determined at trial, and is entitled to rescission of the Joint Venture Agreement and the return of all funds that Halpern advanced to White and/or the venture.

## COUNT II
(Fraud)

139. Halpern hereby incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if set forth herein at length.

140. As set forth above, White knowingly and intentionally made the misrepresentations of fact, summarized in paragraph 134, above, to Halpern prior to and in connection with the formation and Halpern's involvement in and funding of the venture.

141. As further set forth above, upon information and belief, White knowingly and intentionally made the additional misrepresentations of fact, summarized in paragraph 135, above, to Halpern prior to and in connection with the formation and Halpern's involvement in and funding of the venture.

142. White made the foregoing misrepresentations to Halpern with the intent to defraud and deceive Halpern and induce him to act on them in forming, joining and advancing funds to the venture.

143. Halpern reasonably relied on White's misrepresentations in forming, joining and advancing funds to the venture.

144. As a result of the foregoing, Halpern has been damaged in an amount to be determined at trial.

## COUNT III
(Breach of Fiduciary Duty)

145. Halpern hereby incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if set forth herein at length.

146. As Halpern's co-member in, and co-manager of, the parties' venture, White owed Halpern a fiduciary duty of utmost fairness and honesty in all transactions and matters relating to the venture.

147.    White's fiduciary duties to Halpern included the obligation to refrain from misrepresenting any facts or circumstances that could reasonably bear on Halpern's decisions to form, join and advance funds to the venture.

148.    White knowingly breached his fiduciary duty to Halpern through his multiple misrepresentations and other failings and defalcations, as alleged in detail above.

149.    As a result of the foregoing, Halpern has been damaged in an amount to be determined at trial.

## COUNT IV
### (Conversion)

150.    Halpern hereby incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if set forth herein at length.

151.    As alleged above, White, without any authority or legal basis to do so, converted for his own use and benefit substantial funds advanced by Halpern to the venture.

152.    As a result of the foregoing, Halpern has been damaged in an amount to be determined at trial.

## COUNT V
### (Breach of Agreement)

153.    Halpern hereby incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if set forth herein at length.

154.    As alleged above, between 2012 and the end of 2013, plaintiff advanced the $375,000 White Funding to White as an investment in the parties' venture.

155.    In consideration for, *inter alia*, plaintiff's substantial advance of funds, White, on diverse occasions, agreed to personally repay Halpern for the entirety of the $375,000 White Funding from White's own funds and assets.

156.    White breached his aforesaid agreement and guarantee with Halpern.

157.    As a result of the foregoing, Halpern has been damaged in an amount to be determined at trial.

## COUNT VI
### (Fiduciary Accounting)

158.    Halpern hereby incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if set forth herein at length.

159.    As alleged above, White exerted sole and exclusive control over the funds advanced to the parties' venture by Halpern and the revenues, if any, that were or should have been received and paid to the venture.  In his role as co-member in, and co-manager of, the venture, White owed Halpern strict fiduciary duties with respect to each transaction that he undertook involving those funds, and otherwise in connection with the venture.

160.    Halpern repeatedly requested that White disclose the financial books and records of the venture and otherwise provide an accounting of White's financial activities and transactions in connection therewith.

161.    White failed to provide the requested documents and accounting.

162.    In light of the foregoing, Halpern requests that this Court order White to provide a detailed accounting identifying and evidencing all financial activities and transactions in connection with and/or relating to the parties' venture.

163.    To the extent that White cannot satisfy his burden in the context of such accounting to prove with contemporaneous records that each transaction in which he engaged as Halpern's fiduciary was legitimately made, Halpern respectfully requests that the Court order White to reimburse Halpern for each such transaction for which there exists such a failure of proof.

## COUNT VII
(Dissolution of the Limited Liability Company)

164.    Halpern hereby incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if set forth herein at length.

165.    As a result of the conduct of White, as alleged earlier herein, it is not reasonably practicable to carry on the business of Bleecker Street Ventures, LLC in conformity with the parties' Joint Venture Agreement.

166.    As a result of the foregoing, Halpern hereby petitions this Court for dissolution of Bleecker Street Ventures, LLC pursuant to the New York Limited Liability Law § 702.

## **PRAYERS FOR RELIEF**

WHEREFORE, based on the foregoing allegations and averments, plaintiff John Halpern prays that this Court enter the following relief:

A.    Awarding plaintiff compensatory damages in an amount to be determined at trial;

B.    Awarding plaintiff punitive or exemplary damages in an amount to be determined at trial;

C.    Ordering defendant White to provide a detailed accounting to plaintiff of White's financial activities and transactions in connection with the parties' venture and to reimburse and pay to Halpern all amounts that are demonstrated by such accounting to be due to Halpern;

D.    Ordering the dissolution of Bleecker Street Ventures, LLC in accordance with Section 702 of the New York Limited Liability Law.

E.    Awarding plaintiff his attorneys' fees and costs incurred in connection with this action; and

F.    Granting such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff John Halpern hereby demands a jury trial on all issues and claims that are so triable.

ROSENBERG & GIGER P.C.

By: _____
    John J. Rosenberg
    Brett T. Perala
    250 Park Avenue, 12th Floor
    New York, NY 10177
    Telephone: (646) 494-5000

*Attorneys for Plaintiff John Halpern*